UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MELISSA ANN HODDE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:19-CV-44 PLC |
| ) | |
| ANDREW M. SAUL[1], ) | |
| Social Security Commissioner, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

Plaintiff Melissa Hodde seeks review of the decision of Defendant Social Security Commissioner Andrew Saul denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act. The parties consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). [ECF No. 9] For the reasons stated below, the Court reverses and remands the Commissioner's decision.

**I.    Background and Procedural History**

In December 2016, Plaintiff, who was born in November 1970, filed applications for DIB and SSI alleging that she was disabled as of December 20, 2016 as a result of "back injury, torn muscle that will require surgery, removed spleen, 6 broken ribs, unable to walk without a walker or cane, extreme swelling of the back." (Tr. 62-63, 197-204)

---

[1] Andrew M. Saul is now the Commissioner of Social Security and is automatically substituted pursuant to Fed. R. Civ. P. 25(d).

1

The Social Security Administration (SSA) denied Plaintiff's claims in March 2017, and she filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 10). The SSA granted Plaintiff's request for review and conducted a hearing in July 2018. (Id.).

In a decision dated October 10, 2018, the ALJ determined that Plaintiff "has not been under a disability, as defined in the Social Security Act, at any time from December 20, 2016 through the date of this decision." (Tr. 20). Plaintiff subsequently filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review. (Tr. 1-6). Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision.

**II.     Evidence Before the ALJ**

Plaintiff, who was forty-eight years old at the time of the hearing, testified that she lived with her mother and her most recent employment, as a food service manager at a prison, ended November 30, 2016. (Tr. 31) Plaintiff explained that she left that position because "I just was not satisfied. It was not for me." (Id.) Her prior work experience included positions as a food service manager for a residential care facility and manager of a group home. (Tr. 32) Plaintiff was "going through an interview process looking for new work" in December 2016 when a train struck the car she was driving, severely injuring her. (Tr. 31, 38)

Plaintiff testified that she had "some minor arthritis in my back," before the accident, "but this isn't the same." (Tr. 34) She described feeling "like I have a big bubble or something … on the back of my tailbone and … towards the middle lower of my back" and "a lot of clicking." (Id.) Plaintiff stated that she experienced "[n]umbness, pain, tingling, shooting like electrical" from her back to her left knee and right thigh. (Tr. 34-35) Plaintiff underwent steroid injections but explained that they were ineffective: "One time out of several shots, I did get some relief, but not – it only lasted a week or so." (Tr. 38)

Plaintiff stated that her left hip had "been bothering me since the accident," but "lately … I felt like I could collapse when I'm walking." (Tr. 36)  Plaintiff explained that she and her doctor had discussed surgery to repair a "[labral] tear in my socket lining." (Id.)  Plaintiff testified that she was waiting for Medicaid to approve the surgery and the "intensive physical therapy" it would require.  (Id.)

Plaintiff stated that she suffered a concussion in the accident and continued to "have a lot of neck pain, from the base of my skull … and between my shoulders." (Tr. 35)  Plaintiff testified that she had "aching pain" in both shoulders, which made it difficult to sleep and lift things.  (Tr. 37)  According to Plaintiff, her doctor "looked at [her shoulders] and he said it was a lot of muscle tears and a lot of soft tissue damage that there isn't really anything you can do for it." (Tr. 38)  Plaintiff also broke "several" ribs in the accident and, as a result, she experienced pain when she sneezed and discomfort wearing a bra "[be]cause I had a lot of muscle damage as well." (Tr. 35)

Plaintiff took gabapentin for "pain and my nerves," and had declined her doctors' offers of oxycodone because of "the horrors that you hear about with the [opioids.]" (Tr. 39)  To relieve the pain, Plaintiff would lie on her couch and "do stretches with my legs just to try and help." (Id.)  Plaintiff had to change positions throughout the day and spent "several hours a day" reclining.  (Tr. 40)  She explained:  "The morning is the worst and then as the day goes on … it gets a little better but I still have to – like, if I went and did the dishes, I'd have to stop and go sit and recline…." (Id.)

Plaintiff estimated that she could sit fifteen to twenty minutes before needing to "get up and… walk a little bit," and stand fifteen to twenty minutes before her "left leg will start to tremble[.]" (Tr. 41-42)  Plaintiff testified that she was able to lift "eight to ten pounds … definitely walking carrying the groceries in sometimes is a chore, just to get that done." (Tr. 42)

In regard to her mental impairments, Plaintiff testified that, as a result of the accident, she experienced "[d]epression, anger, anxiety in the car…." (Tr. 43) Plaintiff experienced flashbacks to the accident and "[e]very time I hear a train, I can't help but remember about it." (Tr. 46-47) Plaintiff also felt "constant worry" and "anxiety and just fear" about "what's going on inside my body and knowing all the damage that was done…" (Tr. 47) Plaintiff used to be "a happy go lucky type person," but she had begun to self-isolate, explaining, "Vandalia is a very small town and you can't go anywhere without being asked … which obviously I'm still emotional about. I don't think I can put myself out there in the situation where I might have to … talk about the accident …." (Tr. 45) Plaintiff stated that she saw a nurse practitioner, who was overseen by a psychiatrist, for counseling and medications. (Tr. 32)

Plaintiff drove once every two weeks to the grocery store or doctor appointments. (Tr. 30) She did not "go to the grocery store very often unless we just need like one thing. I can't walk … that long in the grocery store." (Tr. 48) When asked about household chores, Plaintiff testified: "I help as much as I can with like the dusting. We have a computer chair that sits in the living room that I use … I roll around on it and dust … cause I can't bend so well and we have those Swiffer things." (Tr. 48) Plaintiff attended "two of [her nephew's] basketball games and a couple of his baseball games, … his state track meet." (Tr. 44) She recently adopted a beagle, which she fed and let outside but rarely walked. (Tr. 46) Plaintiff also enjoyed visiting friends who lived "near the river." (Tr. 46)

A vocational expert testified at the hearing. (Tr. 51-59). The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education and work experience who could "perform work at the sedentary exertion level, but no climbing on ropes, ladders or scaffolds, occasional climbing on ramps and stairs, stooping, kneeling, crouching or crawling and

4

the person should avoid concentrated exposure to vibration and work hazards such as unprotected heights and being around dangerous moving machinery." (Tr. 54). The vocational expert stated that such an individual could perform Plaintiff's previous job as a residence supervisor, but "not as reportedly performed." (Tr. 54). When the ALJ added to the hypothetical question "a further restriction of the sit stand option allowing a change in position every 30 to 60 minutes for a few minutes at a time while remaining at the work station with no loss of production," the vocational expert testified that the supervisor position would still be available, as well as jobs as a patcher and order clerk for food and beverages. (Tr. 54-55) However, when the ALJ added that the hypothetical individual would require unscheduled thirty-minute breaks, the vocational expert stated that this would preclude competitive employment. (Tr. 58)

In regard to Plaintiff's medical records, the Court adopts the facts set forth in Plaintiff's statement of uncontroverted material facts, as admitted by the Commissioner. [ECF Nos. 18, 21-1] The Court also adopts the facts set forth in the Commissioner's statement of additional material facts because Plaintiff does not dispute them. [ECF No. 21-2]

### III. Standards for Determining Disability Under the Social Security Act

Eligibility for disability benefits under the Social Security Act ("Act") requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520(a), 416.920(a). Those steps require a claimant to first show that he or she is not engaged in substantial gainful activity. Id. Second, the claimant must establish that she has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.152(c), 416.920(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quotation omitted). At step three, the ALJ considers whether the Plaintiff's impairment meets or equals an impairment listed in 20 C.F.R., Subpart P, Appendix 1. Id. at 404.1520(d).

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can return to her past relevant work by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f); McCoy, 648 F.3d at 611. If the claimant can still perform past relevant work, she will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. Id.

Through step four, the burden remains with the claimant to prove that he or she is disabled. Moore, 572 F.3d at 523. At step five, the burden shifts to the Commissioner to establish that,

6

given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. 20 C.F.R §§ 404.1520(g), 416.920(g); Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012). If the claimant cannot make an adjustment to other work, then she will be found to be disabled. 20 C.F.R. §§ 404.1520(g), 416.920(g).

## IV. ALJ's Decision

In her decision, the ALJ applied the five-step evaluation set forth in 20 C.F.R. §§ 404.1520, 416.920. (Tr. 10-20) The ALJ determined that Plaintiff: (1) had not engaged in substantial gainful activity since December 20, 2016; and (2) had the severe impairments of "history of left L1 through L5 transverse process fractures, labral tear of the left hip, morbid obesity, and anxiety." (Tr. 12-13) In addition, the ALJ found that Plaintiff had the following non-severe impairments: mild shoulder osteoarthritis, rib fractures, asplenia, hematoma with flank fluid collection, and history of pneumonia and bronchitis. (Tr. 13) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.)

Based on her review of Plaintiff's testimony and medical records, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (Tr. 16) In particular, the ALJ noted that "there are not positive objective findings that would indicate an inability to perform a range of sedentary exertional work." (Id.) The ALJ found that Plaintiff had the RFC to perform sedentary work with the following limitations:

> The claimant requires a sit-stand option allowing change in position every 30 to 60 minutes for a few minutes at a time while remaining at the workstation with

7

> no loss in production. She can perform no climbing on ladders, ropes or scaffolds and occasional climbing on ramps or stairs, stooping, kneeling, crouching, or crawling. She should avoid concentrated exposure to vibration and to work hazards such as unprotected heights or being around dangerous moving machinery. She can understand, remember, and carry out simple instructions consistent with unskilled work and she can tolerate frequent interaction with supervisors and coworkers and occasional interaction with the general public.

(Tr. 15)

Based on the vocational expert's testimony, the ALJ concluded that Plaintiff was unable to perform any past relevant work but had the RFC to perform other jobs that existed in significant numbers in the national economy, such as "patcher" and "touch up screener." (Tr. 18-19) The ALJ therefore concluded that Plaintiff was not disabled. (Tr. 20)

## V.     Discussion

Plaintiff claims that substantial evidence did not support the ALJ's decision. [ECF No. 17] Specifically, Plaintiff challenges the ALJ's RFC determination on the ground that the ALJ did not include limitations for Plaintiff's "moderate deficiencies" in maintaining concentration, persistence, and pace. [Id. at 4] Next, Plaintiff contends that the ALJ failed to fully and fairly develop the record because it did not contain any medical evidence relating to Plaintiff's physical ability to function in the workplace. [Id. at 6] Finally, Plaintiff argues that the ALJ erred in failing to "find spinal canal and neuroforaminal stenosis or advanced facet joint arthritis as severe impairments at Step 2 of the sequential evaluation." [Id. at 10]

In response, the Commissioner asserts that, because substantial evidence in the record as a whole supported the ALJ's RFC determination, the ALJ was not required to obtain medical opinion evidence relating to Plaintiff's functional abilities. [ECF No. 21] The Commissioner further argues that the ALJ properly considered the severity of the impairments affecting Plaintiff's back,

as she discussed Plaintiff's MRIs and found that Plaintiff's lower spinal fractures constituted a severe impairment. [ECF No. 21 at 5]

A. Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)). A court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence support[ing] a contrary outcome." Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]" Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

B. Inadequate Medical Evidence Supporting the RFC[2]

Plaintiff claims the ALJ failed to fully and fairly develop the record because it contained "significant objective findings, supporting multiple physical impairments" but no medical opinion addressing Plaintiff's physical abilities to function in the workplace. [ECF No. 17 at 7] The

---

[2] For ease of analysis, the Court addresses Plaintiff's arguments out of order.

Commissioner counters that Plaintiff bases her argument on outdated case law and the record contained sufficient medical evidence for the ALJ to assess Plaintiff's RFC. [ECF No. 21]

RFC is "the most [a claimant] can do despite [his or her] limitations." 20 C.F.R. §§ 404.1545, 416.945. The ALJ determines a claimant's RFC "based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of [her] limitations." Kraus v. Saul, 988 F.3d 1019, 1024 (8th Cir. 2021) (alteration in original) (quoting Papesh v. Colvin, 786 F.3d 1126, 1131 (8th Cir. 2015)).

"Ultimately, the RFC determination is a 'medical question' that 'must be supported by some medical evidence of [the plaintiff's] ability to function in the workplace.'" Noerper v. Saul, 964 F.3d 738, 744 (8th Cir. 2020) (quoting Combs v. Berryhill, 878 F.3d 642, 646 (8th Cir. 2017)). See also Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016) ("Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace.") (quotation omitted). "Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional." Williams v. Saul, No. 2:19-CV-88 RLW, 2021 WL 1222770, at *10 (E.D. Mo. Mar. 31, 2021) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). An ALJ is not permitted to "draw his own inferences about [a] plaintiff's functional ability from medical reports." Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004) (citing Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2003)).

Plaintiff's medical records reveal that, on December 20, 2016, a train struck the Jeep she was driving and a helicopter transported her to the emergency department at University Hospital in Columbia, Missouri. (Tr. 306-94) CT scans performed upon Plaintiff's arrival at the hospital revealed: "[g]rade 3 splenic laceration with moderate associated hemoperitoneum"; "[m]oderate left pneumothorax with extensive overlying subcutaneous emphysema"; "[d]isplaced left 8th

through 12th rib fractures"; "[r]ight 10th and 11th posterior rib fractures"; "[d]isplaced left L1-L5 transverse process fractures"; and "[s]mall left lumbar hernia near the region of trauma." (Tr. 311-12). Plaintiff underwent an emergency splenectomy and exploratory laparotomy, and she was discharged one week later with, among other medications, hydromorphone, acetaminophen, gabapentin, and topical lidocaine. (Tr. 319, 337)

At follow-up appointments with her primary care physician Dr. Gualberto in January and March 2017, he refilled her oxycodone and ordered imaging. (Tr. 551) An MRI of Plaintiff's lower extremities in March 2017 revealed: (1) large fluid collection in the left flank region; and (2) osteoarthritic changes involving the hips with mild developmental dysplasia. (Tr. 477) A CT scan of Plaintiff's abdomen one week later showed, among other things: (1) "large left posterior/lateral abdominopelvic subcutaneous fluid collection…."; (2) small bilateral effusions with minimal bibasilar atelectasis; (3) multiple rib fractures and left L1-4 transverse process fractures; and (4) status post splenectomy. (Tr. 479)

Plaintiff visited two doctors for treatment of the swelling on her left side in April 2017. (Tr. 413, 535) Plaintiff saw Dr. Guaberto in April and May 2017, and in June 2017, she established care with primary care physician, Dr. Sherder. (Tr. 461, 549-50) At that time, Plaintiff was taking, among other medications, gabapentin, oxycodone-acetaminophen, and clonazepam. (Tr. 461) Plaintiff's primary complaints were low back pain, anxiety, and bilateral shoulder pain "to the point of tears at [] times." (Id.) On physical examination of her upper extremities, Dr. Sherder noted:

> diminished active and passive range of motion to ninety degrees in flexion and abduction; positive empty soda can sign; positive lift-off test; no pain to resisted internal rotation; positive Hawkins; tenderness to palpation along AC joint, anterior shoulder, deltoid, or posterior shoulder; no edema, erythema, or warmth of shoulder joint….

(Tr. 462) Dr. Sherder diagnosed anxiety, chronic back pain (dorsalgia unspecified), asplenia, and bilateral shoulder pain. (Id.) He prescribed buspirone and tramadol, discontinued her oxycodone-acetaminophen, and increased her gabapentin. (Tr. 462-63) Dr. Sherder also referred her to an orthopedic surgeon and pain management specialist. Id.

In July 2017, Plaintiff established care with pain management specialist Dr. Manchanda and orthopedic surgeon Dr. Melander. Dr. Manchanda ordered x-rays of Plaintiff's lumbar spine. The radiology report stated:

> On neutral positioning, alignment is normal. There is very limited motion with flexion and extension. There is mild to moderate diffuse degenerative disc space narrowing. There is advanced facet joint osteoarthritis from L3 through S1. No fracture is seen. There is left sacroiliac joint osteoarthritis.

(Tr. 480) Dr. Melander ordered shoulder x-rays, and they revealed "mild acromioclavicular joint osteoarthritis" on the left and "mild shoulder osteoarthritis" on the right. (Tr. 482, 484)

Plaintiff presented to Dr. Manchanda in September 2017, and he diagnosed "intervertebral disc disorders with radiculopathy, lumbar region." (Tr. 486) Dr. Manchanda refilled Plaintiff's tramadol and administered transforaminal epidural steroid injections (ESI) at left L3-4 and L4-5. (Tr. 487) Later that month, Dr. Manchanda administered an interlaminar ESI at L3-L4. (Tr. 492)

In November 2017, Dr. Manchanda diagnosed Plaintiff with "spondylosis without myelopathy or radiculopathy" of the lumbar and lumbosacral regions, and he administered medial branch blocks "at L2, L3, L4, L5 dorsal ramus, right and left side." (Tr. 495-96) Plaintiff's medications included Aleve, gabapentin, baclofen, tramadol, and Sertraline. (Tr. 495)

Later that month, following Dr. Manchanda's referral, Plaintiff saw orthopedic surgeon Dr. Acevedo for treatment of "nonstop pain mid and lower back." (Tr. 522) Plaintiff rated her pain 6/10 and complained of constant back pain and numbness, as well as intermittent balance problems. (Id.) Plaintiff reported that her lower back pain "sporadically … radiates down her left

lower extremity, specifically over the anterior aspect of the thigh," and stated that she had received "3 epidural steroid injections which have not alleviated her pain" but tramadol "moderately helps." (Tr. 522, 525) On examination, Dr Acevedo observed: "normal posture and gait"; "5/5 strength with bilateral lower extremity hip flexion, knee extension, ankle dorsiflexion and extension, and big toe dorsiflexion"; "2+ pulses distally at bilateral lower extremities"; and negative straight leg raise bilaterally. (Tr. 524)

Dr. Acevedo noted that an MRI of Plaintiff's lumbar spine "shows mild-to-moderate spinal canal and bilateral neuroforaminal stenosis worse on the right side." (Id.) He opined that Plaintiff's "symptoms do not seem to correlate with the area of more stenosis at the L4-L5 level" because they "are mostly or entirely left-sided and the area of more compression is a [sic] right side." (Tr. 525) He discussed with Plaintiff the "nonsurgical versus operative options to decompress the spinal cord and roots," and Plaintiff chose to proceed with nonsurgical management at that time. (Id.) When Plaintiff returned to Dr. Manchanda in January 2018, he repeated the medial branch blocks at L2, L3, L4, L5. (Tr. 499)

In June 2018, Plaintiff presented to Dr. Miller for evaluation of "her left hip pain, numbness and tingling, moderate to severe" and "chronic low back pain." (Tr. 554) Plaintiff informed Dr. Miller that she had received ESIs with no relief, and a facet injection "with 65% relief initially that was then repeated and provide[d] 0% relief." (Id.) She explained that she had stopped tramadol and switched to Topamax, "which she just recently stopped due to concern for her [l]iver…." (Id.) Dr. Miller's examination of Plaintiff's left hip revealed tenderness to palpation of the posterior hip, full range of motion with pain at the limits, and 5/5 motor strength. (Tr. 555) As to Plaintiff's back, Dr. Miller noted: "+ soft tissue swelling vs hypertrophy of muscle upper lumbar/paraspinal area" and "+ mid to lower lumbar spinal and paraspinal tenderness to palpation, negative straight

13

leg bilaterally." (Id.) Dr. Miller diagnosed Plaintiff with degenerative lumbar spinal stenosis and post-traumatic osteoarthritis of left hip, ordered medical imaging, and restarted her Topamax. (Tr. 555-56)

X-rays of Plaintiff's left hip in July 2018 revealed: "[f]indings concerning for superior/anterosuperior labral tear"; "no evidence of fracture or avascular necrosis; and "[i]ncreased signal within the soft tissues of the left flank, significantly improved over the prior examination … likely relates to resolving hematoma." (Tr. 566) A CT scan of Plaintiff's abdominal area showed: "[i]nterval decrease in size of subcutaneous fluid collection within the left flank/gluteal region"; and "[h]ealed/healing left-sided rib fractures" with "[n]onunited transverse process fractures on the left." (Tr. 563)

Plaintiff followed up with Dr. Miller later that month, and he confirmed the diagnosis of labrum tear in Plaintiff's left hip. (Tr. 574) Plaintiff explained that Dr. Melander had recommended arthroscopic surgery and asked for Dr. Miller's opinion. (Id.) Dr. Miller noted that Plaintiff's "pain is persistent and she is using gabapentin for pain, not using nsaid or Tylenol but also using baclofen. She tried Topamax but had undesired side effects and did not tolerate tramadol and didn't get benefits from narcotic pain meds." (Tr. 574) Dr. Miller reviewed the MRI and Dr. Melander's recommendations, and he advised "that since the pain medications were giving her side effects, I would recommend she proceed with surgical correction." (Tr. 575) Dr. Miller prescribed meloxicam. (Id.)

In her decision, the ALJ summarized Plaintiff's testimony and medical records. (Tr. 16-17) The ALJ acknowledged that the record contained "no opinions from a treating provider as to the physical limitations." (Tr. 18) However, the ALJ found, "based on careful review of the evidence," that Plaintiff's "spinal impairment, left hip impairment, and obesity support restricting

14

her to no more than sedentary[3] exertional work with additional postural limitations and environmental restrictions…." (Tr. 18) More specifically, the ALJ determined that Plaintiff could: perform sedentary work with a sit-stand option; occasionally climb on ramps or stairs, stoop, kneel, crouch, or crawl; and never climb ladders, ropes, or ladders. (Tr. 15)

In the absence of medical opinions relating to Plaintiff's functional limitations, the ALJ based the RFC determination on medical examinations in which doctors noted that Plaintiff exhibited a normal gait, normal posture, no swelling or deformity of the lower extremities, full lower-extremity strength, and negative straight-leg raising. (Tr. 16) However, it is not clear "how these observations made during a medical examination relate to Plaintiff's functional ability in the workplace." Priddy v. Saul, No. 4:19-CV-945 RLW, 2020 WL 7024237, *8 (E.D. Mo. Nov. 30, 2020). An ALJ "may not simply draw [her] own inferences about [a] plaintiff's functional ability from medical reports." Strongson, 361 F.3d at 1070. See also Combs, 878 F.3d at 647 (the ALJ "erred in relying on his own inferences as to the relevance of the notations 'no acute distress' and 'normal movement of all extremities'"); Pates-Fire v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009) (an ALJ may not "play doctor").

"The Eighth Circuit has held that, in some cases, mild or unremarkable objective medical findings and other evidence may constitute sufficient medical support for an RFC finding, even in the absence of any medical opinion evidence directly addressing [the plaintiff's] ability to function

---

[3] Under the regulations, sedentary work involves:

> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

15

in the workplace." Massa v. Saul, No. 4:18-CV-877 SPM, 2019 WL 4305010, at *5 (E.D. Mo. Sep. 11, 2019) (citing Stringer v. Berryhill, 700 F. App'x 566, 567 (8th Cir. 2017) and Hensley, 829 F.3d at 929-34). In this case, however, the record does not contain consistently mild or unremarkable objective findings. To the contrary, x-rays in July 2017 revealed advanced facet joint osteoarthritis from L3 through S1, mild to moderate diffuse degenerative disc space narrowing, and left sacroiliac joint osteoarthritis, and x-rays of her left hip in July 2018 showed a labral tear. Furthermore, Plaintiff consistently reported to her providers severe back and left hip pain. She saw a pain management specialist, underwent several ESIs and medial branch blocks with no relief, and took narcotic and non-narcotic pain medications.

Plaintiff's medical records supported her assertion that her chronic pain significantly limited her ability to sit for prolonged periods of time and required her to take regular breaks to walk and recline. See, e.g., Massa, 2019 WL 4305010, at *6. Under the circumstances here, when evaluating Plaintiff's RFC, the ALJ "was required to consider at least some supporting evidence from a professional." Lauer, 245 F.3d at 704. See also Noerper, 964 F.3d at 746 ("There is simply no reliable evidence providing a basis for the specific conclusion that" the plaintiff could perform the functions required by light work.); Williams, 2021 WL 1222770, at *15 (the ALJ "made improper inferences about [the plaintiff's] ability to function in the workplace based on 'normal' notations in the medical records"); Priddy, 2020 WL 7024237, *9 ("By relying on his own interpretation of what 'normal gait and station' and 'normal tone and no atrophy' meant in terms of [the plaintiff's] RFC, without medical evidence as [to the plaintiff's] functional ability, 'the ALJ failed to satisfy his duty to fully and fairly develop the record.'").

The Commissioner argues that Plaintiff's claim is "based on a commonly argued, but incorrect interpretation of the regulations and case law." [ECF No. 21 at 11] In support of his

position, the Commissioner relies on Lockwood v. Colvin, 627 F. App'x 575 (8th Cir. 2015). In that case, the plaintiff claimed that the ALJ erred because the RFC was not supported by "some medical evidence." Id. at 577. In rejecting Plaintiff's argument, the court affirmed that "an ALJ's assessment of [the RFC] must be supported by some medical evidence of the claimant's ability to function in the workplace," but cautioned that "an ALJ is not limited to considering medical evidence exclusively…. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." Id. (quoting Cox v. Astrue, 495 F.3d 614, 619-20 (8th Cir. 2007)). The Lockwood court affirmed the denial of benefits because "the administrative record included extensive medical evidence relating to the examination and treatment of [the plaintiff's] severe impairments" and the "objective clinical and diagnostic evidence does not support the [plaintiff's] allegations of disabling limitations." Id. (internal quotation omitted).

Unlike the record in Lockwood, the record in this case does not contain extensive medical evidence supporting the ALJ's finding that Plaintiff was physically capable of performing sedentary work. To the contrary, when considering the instant record as a whole, the degree to which Plaintiff's spinal and hip impairments imposed functional limitations is not self-evident. See, e.g., Noerper, 964 F.3d at 746.

While it is the claimant's burden to establish her RFC, the ALJ has an independent duty to develop the record. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). In some cases, the duty to develop the record requires the ALJ to obtain medical evidence, such as a consultative examination of the claimant, before rendering a decision. See 20 C.F.R. § 404.1519a(b); Noerper, 964 F.3d at 740 ("further development is required as to the functional limitations on walking and standing"). "It is reversible error for an ALJ not to order a consultative examination when such

an evaluation is necessary for [her] to make an informed decision." Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000) (quotation omitted). See also Allen v. Berryhill, 4:16-CV-652 DDN, 2017 WL 2062267, at *4 (E.D. Mo. May 15, 2017).

Upon review, the Court finds that the record is underdeveloped in that there is no medical evidence addressing how Plaintiff's physical impairments affected her ability to work. The ALJ did not fulfill the duty to develop the record because it lacked medical evidence relating to Plaintiff's functional limitations.[4] On remand, the ALJ may need to further develop the record regarding Plaintiff's ability to function, perhaps by contacting one of her treating physicians or by obtaining the services of a consultative examiner.

## VI.     Conclusion

Because the ALJ failed to fully and fairly develop the record, the Court reverses and remands this case for further consideration. Accordingly,

**IT IS HEREBY ORDERED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

An order of remand shall accompany this memorandum and order.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 7th day of July, 2021

---

[4] Because the ALJ did not fulfill her duty to fully and fairly develop the record, the Court does not consider Plaintiff's claims that the ALJ erred at step two of sequential evaluation and in formulating her mental RFC.